UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID F. SUND,

          Plaintiff,

    v.

HARTFORD LIFE AND ACCIDENT
INSURANCE CO.,

          Defendant.

Case No. 21-cv-05218-JST

**ORDER RE: MOTIONS FOR
JUDGMENT UNDER RULE 52**

Re: ECF Nos. 40, 41

       Before the Court are Plaintiff David F. Sund and Defendant Hartford Life and Accident
Insurance Co.'s ("Hartford") cross-motions for judgment under Federal Rule of Civil Procedure
52.  ECF Nos. 40, 41.  The Court will grant Sund's motion and deny Hartford's motion.

## I.      PROCEDURAL BACKGROUND

       In 2021, Sund filed this complaint against Hartford and Amazon.com Services, Inc.
Employee Benefit Plan (the "Plan") pursuant to Section 502(a)(1)(B) of the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking recovery of long-term
disability benefits.  ECF No. 1.  Sund subsequently dismissed the Plan by stipulation.  ECF No.
19.

       Now before the Court are Sund's and Hartford's cross-motions for summary judgment.
ECF Nos. 40, 41.

## II.     JURISDICTION

       The Court has jurisdiction under 28 U.S.C. § 1331.

## III.    LEGAL STANDARD

       Rule 52 of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the
facts without a jury or with an advisory jury, the court must find the facts specially and state its

United States District Court
Northern District of California

1    conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  When presented with motions for

2    judgment under Federal Rule of Civil Procedure 52, "the court conducts what is essentially a

3    bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding

4    which is more likely true."  *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 990 (N.D. Cal. 2008).

5    "In a Rule 52 motion . . . the court does not determine whether there is an issue of material fact,

6    but whether the plaintiff is disabled under the policy," and "is to 'evaluate the persuasiveness of

7    conflicting testimony,' and make findings of fact."  *Wiley v. Cendant Corp. Short Term Disability*

8    *Plan*, Case No. 09-00423 CRB, 2010 WL 309670, at *6 (N.D. Cal. Jan. 19, 2010) (quoting

9    *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)).

10           The parties agree that the standard of review is de novo.  ECF No. 25.

11   **IV.    FINDINGS OF FACT**[1]

12          **A.     Sund's Employment History and Injury**

13           Sund worked as a global commodity manager at Lab126, ECF No. 39-1 at 388, which is

14   part of the Amazon.com Services, Inc. group of companies (with Lab126, "Amazon"), *id.* at 1184.

15   The original posted job description for this title listed eleven key competencies: (1) "Bias for

16   Action: Evaluates acts and communicates in internet time[, is] [d]ecisive, makes timely practical,

17   effective decisions[,] and "[t]akes initiative without being asked"; (2) "Negotiations: [has the]

18   [a]bility to influence and negotiate the optimal arrangement for Lab 126 with external suppliers";

19   (3) "Cost Savings: [makes a] [c]ontinuous effort to drive cost out of Lab 126's infrastructure"; (4)

20   "Persuasive: Demonstrates healthy and productive influencing ability[, g]ains the respect and

21   confidence of others[, and] [b]uilds constructive and effective relationships"; (5) "Open and

22   Strong Communications Skills: [has a w]illingness to ask and honestly answer the tough

23   questions[, t]reat[s] others' opinions with respect[, f]osters open communications and candid

24   discussions[, s]hare[s] information that helps other do their job well[, and] [k]eeps other[s] in the

---

[1] This order makes factual findings and states conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  "To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered 'in [their] true light, regardless of the label that the . . . court may have placed on [them].'"  *Rodriguez v. Barrita, Inc.*, 62 F. Supp. 3d 936, 938 n.1 (N.D. Cal. 2014) (alterations in original) (quoting *Tri–Tron Int'l v. Velto*, 525 F.2d 432, 435–36 (9th Cir.1975)).

United States District Court
Northern District of California

loop"; (6) "Manages System and Processes: [e]ffectively uses systems and processes to measure, monitor, manage, and impact performance[, as well as] [i]mproves processes and builds scalability"; (7) "Self-Starter, proactive, initiates action and diligently looks for break-through practices and continuous improvement opportunities"; (8) "Strong Presentation Skills[,] including the ability to present to senior leadership"; (9) "Financial Analysis Knowledge: [has k]nowledge and application of the principles of financial analysis (e.g., life cost analysis, net present value, profit, value added)"; (10) "Supplier Capabilities: [has k]nowledge of the capabilities of relevant contracted vendors/suppliers/agencies"; and (11) "Vendor Management: "[t]he ability to evaluate and ensure that vendor performance meets or exceeds defined performance standards and adheres to overall company policies and procedures." *Id.* at 1182–83.

The category specific activities within these key competencies were: "Understand[ing] and perform[ing] comparative analysis of bid submissions"; "Lead[ing] sourcing engagements and sourcing teams in conducting of opportunity identification and RFx's where appropriate"; "Implement[ing] supplier agreements/contracts by working with cross functional stakeholders and suppliers to reach agreement on contract terms and conditions"; "Manag[ing] supplier relationships and be[ing] [the] primary business contact for key suppliers"; "Project [m]anagement," specifically the "[a]bility to manage complex multiple projects to ensure successful delivery (on time, within budget, meeting agreed upon success criteria) to establish clear goals and accountabilities," and "the ability to develop project plans, allocate resources, identify potential issues/risks and develop contingency plans"; and "[c]ontracts," specifically "[k]nowledge of legal terms and conditions related to supplier agreements." *Id.* at 1183.

Sund states that in his role as a global commodity manager he "convert[ed] all manufacturing to fully automated lines from manual lines"; "negotiated contracts"; "created purchasing logistical process for this commodity"; and "managed supplier qualification through time." *Id.* at 382.  He further states that he was required to spend "40-50% of [his] time . . . travelling to customer facilities in Asia, Europe and throughout the United States," including "approximately 90 days a year in China . . . ." *Id.*

In August 2018, during a work trip in China, Sund "slipped on wet marble and fell, landing

3

backwards on his low back."[2]  *Id.* at 1150.  During the fall, "he heard a crack sound and had immediate back pain."  ECF No. 39-1 at 1150.  Shortly after the accident, Sund sought treatment at a local hospital in Shenzhen, China, where x-rays were taken that "showed that he had a lumbar fracture."  *Id.*  Sund was then transferred and admitted to Matilda Hospital in Hong Kong, where he received a CT scan of his low back and "was diagnosed with L2 compression fracture."  *Id.*  Sund also received "a [Thoracic-Lumbar-Sacral-Orthosis ("TLSO")] brace and therapy in . . . with pain medication" before he was discharged and flew back to the United States on September 13, 2018.  *Id.*

On October 8, 2018, Sund was cleared to return to work with modified duties.  When Sund returned to work, he was working four-hour days.  *Id.* at 1217.  Sund's last day worked as a global commodity manager was February 1, 2019.  *Id.* at 74.  Sund states that he continued as an Amazon employee until he was formally terminated in June 2020 after he and human resources searched for but could not find a position within Amazon that "fit [his] skill set and accommodate[d] [his] restrictions," which included the need to "recline at work."  *Id.* at 383.

### B.    Sund's Long-Term Disability Plan

Amazon maintains a group long-term disability plan for its employees that is governed by ERISA.  *Id.* at 1304–06.  Hartford issued a group insurance policy ("the Policy") funding the disability benefits provided by Amazon, which became effective October 1, 2017.  *Id.* at 1275–1310.  Sund was covered by the Policy during his employment at Amazon.  *Id.*

Under the Policy, long-term disability benefits are payable for any employee if they: "1) become Disabled while insured under The Policy; 2) are Disabled throughout the Elimination Period; 3) remain Disabled beyond the Elimination Period; and 4) submit Proof of Loss to [Hartford]."  *Id.* at 1292.  Here, the elimination period is 180 days was from February 2, 2019

---

[2] The exact date of Sund's injury is not clear from the record, which lists it as August 20, 2018, August 21, 2018, and August 22, 2018.  *E.g.*, *id.* at 176, 380, 388, 394, 396–97, 540, 1150, 1209, 1217.  Because the exact date of Sund's injury is not relevant to the Court's decision, it need not make a finding on this issue.  *See Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986) ("One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision.  This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions.").

United States District Court
Northern District of California

through August 2, 2019. *Id.* at 141. Additionally, twenty-four months is the maximum duration

of benefits for employees like Sund who are disabled at age 65. *Id.*

The Policy defines "[d]isabled" as follows:

> Disability or Disabled means You are prevented from performing
> one or more of the Essential Duties of:
> 1) Your Occupation during the Elimination Period;
> 2) Your Occupation, for the 24 months following the Elimination
> Period, and as a result Your Current Monthly Earnings are less than
> 80% of Your Indexed Pre-disability Earnings; and
> 3) after that, Any Occupation.

*Id.* at 1300. An "Essential Duty" is one that "1) is substantial, not incidental; 2) is fundamental or

inherent to the occupation; and 3) cannot be reasonably omitted or changed." *Id.* The employee's

"ability to work the number of hours in [their] regularly scheduled workweek is an Essential

Duty," but "working more than 30 hours per week is not an Essential Duty." *Id.* Additionally,

"Your Occupation" means "Your Occupation as it is recognized in the general workplace"; it

"does not mean the specific job You are performing for a specific employer or at a specific

location." *Id.* at 1303.

### C. Sund's Medical Records

#### 1. Treatment at Kaiser Permanente

Upon returning to the United States, Sund was treated by Dr. Devina Grover and Dr. Thao

Pham at Kaiser Permanente. *Id.* at 1209. On September 18, 2018, Sund saw Dr. Grover, who

diagnosed him with a "lumbar vertebral traumatic wedge compression fracture" caused by an

accidental fall. *Id.* at 1211. Dr. Grover advised Sund that he should: (1) "continue wearing TLSQ

brace" at all times; (2) "increas[e] his activity level with [the] brace on," including by "go[ing] for

short walks and . . . performing his daily home activities on [an] as tolerated basis"; and (3) "avoid

bending/twisting." *Id.* Additionally, Dr. Grover and Sund discussed "[p]ain management . . . in

detail"; that she "encouraged [him] to wean off the oxycodone"; and "[p]rescribed ibuprofen" and

"acetaminophen-codeine." *Id.* Dr. Grover stated that Sund should be off work until October 1,

2018 and listed his restrictions as "[h]as difficulty changing positions or ambulating without use of

support." *Id.*

The same day, Sund had x-rays taken of his thoracic spine and lumbar spine. *Id.* The x-

United States District Court
Northern District of California

ray of the thoracic spine indicated "[b]ack trauma" and the impression was "[m]ild diffuse degenerative change." *Id.* The x-ray of the lumbar spine indicated "[t]rauma" and the impression was "[c]ompression fracture of L2 not present on the 2015 exam and the age is indeterminate." *Id.*

On September 25, 2018, Dr. Pham saw Sund and diagnosed him with an "L2 vertebral traumatic wedge compression fracture." *Id.* Dr. Pham noted that Sund "complained [of] mild low back pain at [a] level [of] 3/10"; "[h]as been using Lofstrand crutches and his TLSO brace 24 hours/day"; "feels 50-60% improvement"; and was "[t]aking ibuprofen" and "Tylenol No. 3 as needed." *Id.* Dr. Pham recommended that Sund "start conditioning exercises" and physical therapy two times a week for up to six visits, and prescribed Ambien for Sund. *Id.*

An MRI was conducted on Sund's lumbar spine on October 1, 2018, which "showed 20% compression fracture at L2 with no central canal or foraminal stenosis." *Id.* at 1151. On October 8, 2018, Sund saw Dr. Grover who noted that Sund's back pain was "reduced" and "intermittent," and Sund was at a pain level of four out of ten. *Id.* Dr. Grover further noted that Sund had "started doing household tasks like laundry, going for short walks[,] and some office type work from home," but Sund's back would "get[] sorer with prolonged walking more than 10-15 minutes." *Id.* Dr. Grover recommended that Sund start physical therapy, "wean off [his] brace gradually[,] and continue increasing [his] level of activity on [an] as tolerated basis." *Id.* Finally, Dr. Grover permitted Sund to return to work on "modified duty" until October 22, 2018. "Modified duty" included the following restrictions: "No lifting, pushing or pulling. Avoid bending, twisting, climbing. May alternate sit/stand on as tolerated basis. Avoid prolonged standing/walking, maximum 15 minutes per hour." *Id.*

Sund had a physical therapy appointment with Shalaka A. Taware on October 15, 2018. *Id.* at 1212. Taware noted that Sund had pain in his "lumbar spine," which he rated as eight out of ten. Taware recommended physical therapy two times per week for six weeks. *Id.* Sund participated in physical therapy sessions from October 15, 2018 to October 26, 2018. *Id.*

Sund saw Dr. Pham again on October 22, 2018. *Id.* Dr. Pham noted that Sund had four of six physical therapy sessions outside of Kaiser and was "progressively doing well" with the physical therapy; had no complaints of much pain in his lower back; was taking ibuprofen; and

1    was working on modified duty.  *Id.*  Sund also told Dr. Pham that he would be moving to Oregon

2    for three months on November 9, 2018.  *Id.*  Dr. Pham continued Sund on modified duty at work

3    until November 8, 2018.  *Id.*  "Modified duty" included the following restrictions:  "No lifting,

4    pushing or pulling of 5 lbs.  Avoid bending, twisting, climbing.  May alternate sit/stand or as

5    tolerated basis.  Avoid prolonged standing/walking, maximum 30 minutes per hour."  *Id.*

6           Sund had his final in-person appointment with Dr. Pham on November 8, 2018.  *Id.*  Dr.

7    Pham noted that Sund was "ready to leave for Oregon"; had no back pain; completed physical

8    therapy; was taking Advil twice a day as needed; and was "progressively doing well."  *Id.* at

9    1212–13.  Dr. Pham further noted that he ordered an x-ray, but Sund "did not have it done," and

10   additional physical therapy "was authorized for only 2 more" sessions, "which [Sund would]

11   arrange in Canon Beach, O[regon]."  *Id.* at 1213.  Finally, Dr. Pham stated that Sund could

12   continue modified duty at work until November 30, 2018 with the same restrictions.

13          On November 30, 2018, Sund had a phone appointment with Dr. Pham from Oregon.  Dr.

14   Pham wrote that Sund's "low back [was] stable" and he was "progressively doing well";

15   "[c]onstant walking bothered [Sund]"; and Sund was "[w]orking light duty."  *Id.*  Additionally,

16   could continue working on "modified duty" with the same restrictions until January 3, 2019.  *Id.*

17          Sund had his next phone appointment with Dr. Pham on January 3, 2019.  Dr. Pham again

18   noted that Sund's "low back is stable" and that he was "[w]orking light duty," but also noted that

19   his "symptoms [were] aggravated with prolonged sitting more than 20 min[utes]" and that he was

20   taking three Advil pills per day.  *Id.* at 925.  Sund was to continue modified duty at work with the

21   same restrictions until January 22, 2019.  *Id.* at 1213.

22          Sund had two in person appointments in January 2019.  First, on January 21, 2019, Sund

23   had an x-ray taken on his lumbar spine, which indicated Sund had "chronic low back pain."  *Id.* at

24   856.  As compared to the September 18, 2018 x-ray, the x-ray showed a "[m]ild [i]ncrease in

25   compression of L2 with sclerosis"; "loss of approximately 25% of the vertebral body heights";

26   "[m]ild disc narrowing at L5-S1"; "[f]acet joint hypertrophy at L4-5 and L5-S1"; and "[a]ortic

27   atherosclerosis."  *Id.*  Second, the next day, Sund saw Dr. Pham.  Sund told Dr. Pham that he

28   planned to move to Oregon permanently and "[h]e would like to transfer his care to Kaiser Occ

7

Med in Oregon." *Id.* Dr. Pham noted that Sund's "low back is stable," but he had "persistent pain" and his pain level at the time was a of two out of ten. Sund was working "light duty." *Id.* Dr. Pham also noted that Sund's "symptoms [were] aggravated with prolonged sitting more than 20 min[utes]"; he was "[t]aking 2x Advil in AM and Tylenol in PM"; he was "[l]ying on the exam [table] with discomfort" and had ; "[d]ifficulty . . . get[ting] up from" it; and had "[l]imited AROM of lumbar spine." *Id.* at 913. Additionally, Dr. Pham observed that that Sund had "[m]uscle strength of five out of five for his "bilateral lower extremities" and his "[s]ensory to light touch" was "normal." *Id.* Dr. Pham discussed a "ve[r]tebroplasty procedure," and Sund responded that "[h]e would like to think about it." *Id.* at 914. Dr. Pham stated that Sund could continue "light duty" and the modified work that he had been doing through February 8, 2019. *Id.* The modified work restrictions also applied at home. *Id.*

Sund had a telephone appointment with Dr. Pham on February 8, 2019. *Id.* at 995–1001. Sund stated that he had permanently moved to Canon Beach, Oregon and that he had been unsuccessful in finding a primary treating physician, but he was going to see if his family medicine doctor would take workers' compensation and treat him for his back pain. *Id.* at 995–96. Dr. Pham wrote that Sund's "low back is stable," but it had been "worse with cold weather." *Id.* at 995. He also noted that Sund was taking three Advil pills per day, *id.*, and stated that Sund should continue "modified work" through February 12, 2019, *id.* at 996.

Sund had another telephone appointment with Dr. Pham on March 13, 2019. *Id.* at 1118–23. The notes from this appointment are identical to those from the February 8, 2019 appointment, except for instead of listing "modified work," they say that Sund should continue "light duty." *Id.* at 1119.

On April 3, 2019, Sund had a telephone appointment with Dr. Pham. *Id.* at 1124–28. Dr. Pham again noted Sund's difficulty finding a primary treating physician in Oregon and that Sund was no longer working because his employer could not accommodate modified work. *Id.* at 1124. Dr. Pham wrote that Sund "had a new MRI and he was not recommended for ve[r]tebralplasty," but he was "feeling better everyday." *Id.* And stated that Sund was reaching maximum medical improvement ("MMI") and should continue "light duty." *Id.* at 1125.

1     Sund had telephone appointments with Dr. Pham on April 11, 2019 and April 23, 2019

2    where they discussed scheduling an appointment for Sund's permanent and stationary ("P&S")

3    report.  *Id.* at 1129–42.  Dr. Pham again noted that Sund was "[n]ot working due to lack of

4    accom[m]odation from" Amazon.  *Id.* at 1129, 1138.  The treatment plan was for Sund to continue

5    "light duty."  *Id.* at 1130, 1139.

6         On May 7, 2019, Sund had his P&S report appointment with Dr. Pham.  *Id.* at 1143–47.

7    The notes from the appointment stated that Sund has "complaints of constant low back pain" and

8    that he usually has a pain level of two out of ten, but that "changes with pressure and weather."

9    *Id.* at 1143.

10        Dr. Pham completed his P&S report and return-to-work and voucher report on May 14,

11   2019.  *Id.* at 1148–49, 1150–58.  On the return-to-work and voucher report, Dr. Pham checked that

12   Sund could "work with restrictions" and listed the following permanent restrictions: "No lifting,

13   pushing or pulling 5lbs.  Avoid bending, twisting, climbing.  May alternate sit/stand on as

14   tolerated basis.  Avoid prolonged standing/walking, maximum 30 minutes per hour."  *Id.* at 1148.

15   The report included boxes for hour limits on things like standing, sitting, and walking, but Dr.

16   Pham did not check any of those boxes.  *Id.*  Dr. Pham also checked "yes," in response to the

17   question of "[a]re the [w]ork [d]uties compatible with the activity restrictions set forth in the

18   provided job description."  *Id.*

19        Dr. Pham also prepared a separate P&S report that diagnosed Sund with "L2 vertebral

20   traumatic wedge compression fracture (ICD Code S32.020D)" and "[c]hronic low back pain

21   (G89.29, M54.5)."  *Id.* at 1152.  In the report, Dr. Pham noted that Sund's "current symptoms

22   (subjective complaints)" were "constant low back pain at level 2/10 locally on VAS[,] . . . . limited

23   low back range of motion," and "very limited" functional ability because "he cannot sit for more

24   than 30 minutes, lift heavy weight, or prolonged standing and walking for long period."  *Id.* at

25   1151.  Dr. Pham observed that during the physical examination, Sund was "uncomfortable"; "lay

26   on the exam bed" at a 30 degree angle; "had a hard time from a lying to sitting position"; and that

27   "[t]here was tenderness at L2 level lumbar spine," which was worse on the left side.  *Id.* at 1151.

28        Additionally, Dr. Pham concluded that Sund had a whole person rating of eight percent

United States District Court
Northern District of California

pursuant to the American Medical Association (AMA)'s Guides to the Evaluation of Permanent Impairment (5th edition).  *Id.* at 1152.  Dr. Pham "place[d] [Sund's] condition into lumbar category II," which provides rates of "between a 5% and 8% impairment of the whole person."  *Id.*  And Dr. Pham chose eight percent because Sund "has moderate ADL dysfunction" and "was not able to return to regular duty due to his chronic low back pain."  *Id.*  Dr. Pham also found that "100% of the . . . impairment was directly caused by" Sund's fall in China.  *Id.* at 1153.

Finally, Dr. Pham stated that Sund would "require permanent work restrictions including no lifting, pushing, or pulling more than 5 pounds"; need to "[a]void repetitive bending, twisting, or climbing"; "may alternate sitting and standing as tolerated"; and "[a]void prolonged standing, walking, or sitting, a maximum of 30 minutes per hour."  *Id.*  And under "[f]uture [m]edical [c]are," Dr. Pham noted that Sund took 400 milligrams of Advil per day; "should be provided pain medication if needed"; "should be allowed to renew [his VQ OrthoCare lumbar brace support] once or twice per year depending on how often he is using it; and "should be provided [physical therapy] if his pain is exacerbated due to weather changes."  *Id.*

## 2.    Treatment with Dr. Jimmy Huebert and Dr. David Siker

On March 4, 2019, Sund saw neurologist Dr. Jimmy Huebert, *id.* at 1187–90, who diagnosed him with an "L2 compression fracture with continued back pain and limitations."  *Id.* at 1188.

Huebert noted that Sund had a pain level of two out of ten, "ha[d] been wearing a neoprene back sleeve which provides only a modicum of improvement," and that while he has "incrementally made some improvements," he is "still fairly limited."  *Id.* at 1187–88.  Dr. Huebert reported the following regarding Sund's spine:

> [F]lattened lumbar lordosis, he [was] fairly guarded and apprehensive with both flexion and extension of his lumbar spine, rotation and extension [was] slightly more uncomfortable going to the right than to the left.  Compression over the spinous processes in his mid lumbar region [was] moderately uncomfortable.  There [was] no neural compressive signs.  He is fairly guarded with Trendelenburg but there [were] no deficits noted.

*Id.* at 1188.  Additionally, Dr. Huebert analyzed the January 2019 x-ray of Sund's spine, finding

United States District Court
Northern District of California

that it showed a "[s]ignificant L2 compression fracture," and while the read out indicated a "loss of approximately 25% of the vertebral body heights," the loss "appear[ed] to be more." *Id.* at 1187.

Dr. Huebert provided Sund (1) "a more supportive lumbar brace" and (2) a "prescription of Miacalcin nasal spray to be taken as directed." He also noted that he would refer Sund to "an attending physician" at "Rehabilitation Medicine Associates" and "recommend[ed] an evaluation for a possible kyphoplasty." *Id.* Sund stated that he completed referral forms for diagnostic imaging at Siker Medical and for a consult with a physician at Rehabilitation Medicine Associates. *Id.* at 1189–90.

Sund then saw Dr. David Siker for an MRI of his lumbar spine with and without contrast on March 20, 2019. *Id.* at 1215. The indication of the MRI was that there was a "L2 compression fracture" and Sund had "low back pain" with pain and symptoms that "increase[d] with sitting, walking, bending forward, lifting and twisting." *Id.* The impression was a "[c]ompression fracture deformity on the L2 vertebral body, which [was] likely subacute in age with approximately 45% loss of vertebral body stature and mild 3.5 mm retropulsion" with the following features: (1) "diffuse marrow edema mostly involving upper half, with prominent horizontal fracture cleft"; (2) "[m]ultilevel mild disc bulging and mild-to-moderate facet arthrosis resulting in mild canal narrowing at L3-L4 and L4-L5 without canal stenosis [and] [m]ild narrowing of the lateral recesses at L4-L5"; (3) "[m]ild left L5 and mild bilateral L4 foraminal narrowing without nerve root encroachment"; and (4) "[s]mall left L1 foraminal/extraforarninal disc herniation without definite nerve root encroachment." *Id.*

Sund stated that Dr. Huebert and Dr. Siker "asked why [he] did not have Vertebrae Plasty Surgery when [he] was injured," and he "explained that the Hong Kong doctors and Kaiser recommended that [he] wait." *Id.* at 381. He also stated that "Dr. Hubert [sic] and Dr. Siker respectively agreed that it was too late to have [that] procedure done." Sund explained that he did not continue care with either doctor because "[n]o doctor in Oregon would see [him] because" of his "ongoing CA OSHA case," so he went to his "personal physician Dr. Anita [sic] Richardson and asked to be referred to a specialist." *Id.*

### 3.      Dr. Anisa Richardson

On April 4, 2019 and June 4, 2019, Sund saw his internist, Dr. Anisa Richardson, for back pain and other conditions. *Id.* at 606. Dr. Richardson noted that Sund "had a compression fracture [of his L2] in 2018"; "[w]as told at Kaiser not to get vertebroplasty and wait to see if it would heal[,] [t]hen when it didn't he was seen in Portland and the surgeons told him he should have had it in the first 2 days and now it is too late"; and that "[h]e has been on calcitonin nasal and is almost done." *Id.* at 606, 1264. On June 4, 2019, Dr. Richardson conducted a review of systems and physical examination of Sund and noted that Sund had back pain, tenderness, decreased range of motion in the lower back, but had no neck, joint, or muscle pain, had no swelling, and had normal strength. *Id.* at 606–07.

Sund saw Dr. Richardson again for back pain on February 11, 2020. *Id.* at 1263–66. Dr. Richardson noted the following on Sund's back pain: "[s]till has persistent low back pain that is worse with prolonged sitting"; "[n]ow unable to walk long distances without needing to lie down"; "[c]an't lay flat but needs to have his back at a 11-15 degree angle"; "[n]o radiation down his legs but does seem to have pain into his pelvis"; "he is a 2/10 for pain but if he sits any longer it will slowly increase to a 4/10 and then further until he can't bare [sic] it"; "[n]o new progression of symptoms except that he had a sharp spasming pain that radiated down his leg and caused him to fall and fracture his foot"; and "[h]e would like to go to a spine specialist to discuss options for his pain." *Id.* at 1263. The notes on the review of systems and physical examination of Sund are identical to the notes from his June 4, 2019 visit, except they also stated that Sund had "tenderness on palpation of lumbar paraspinals." *Id.* at 1265.

Dr. Richardson referred Sund to the "Spine Clinic for further evaluation and treatment" and signed his disability parking permit. Dr. Richardson also ordered a "[m]ultiplanar multisequence MRI of [Sund's] lumbar spine without contrast," which was conducted on March 9, 2020. *Id.* at 1259. The impression of the MRI was that Sund had "a chronic healed compression of L2 with approximately 60% height loss centrally and minimal, 4 mm, retropulsion of the posterior superior endplate which indents the ventral thecal sac but does not cause significant spinal canal stenosis." *Id.* at 1260.

United States District Court
Northern District of California

### 4.   Qualified Medical Evaluation by Dr. Ramon Jimenez

On October 25, 2019, Dr. Ramon Jimenez conducted a Qualified Medical Evaluation of Sund, which involved a physical examination of Sund and review of his medical records.  *Id.* at 1208–20.  Sund's complaints during the evaluation were that "[h]e has pain to his low back" which is present most of the time."  *Id.* at 1209.  Sund "rate[d] the pain at a level of about 3 to 4," but also stated that it "increase[d] to a level of 6 if he is sitting or standing for too long," which was "usually . . . after about 20 minutes."  *Id.*  Dr. Jimenez diagnosed Sund with a compression fracture of his L2.  *Id.* at 1217.  In report's discussion section, Dr. Jimenez concluded that as of October 25, 2019, Sund had "reached the point of" MMI because the "concurrent or concomitant evidence of degenerative arthrosis of the lower segments could lend to persistent signs and symptoms."  *Id.* at 1205.

Dr. Jimenez concluded that the "[s]ubjective factors of disability are [c]onstant and [m]oderate, increasing to [i]ntermittent and [m]oderate/[s]evere," and the "[o]bjective findings are . . . localized tenderness."  *Id.* at 1218.  He also concluded that he "would place [Sund] into DRE lumbar Category III with a resultant whole person impairment of 13%."[3]  *Id.* at 1219.

Dr. Jimenez placed the following restrictions on Sund's ability to work: "He should do no bending, stooping or lifting greater than ten pounds, and no prolonged walking, standing, sitting or climbing."  *Id.*  He stated that "supplemental job displacement benefits might be applicable if his disability and work preclusions are not accommodated."  *Id.* at 1218.  Additionally, he recommended the following future treatment: (1) "see[ing] his primary treating physician"; (2) "undergo[ing] an MRI and TC-99 bone scan to document the status of healing: (3) "wean[ing] him from the lumbosacral support"; and (4) "gym membership at a facility with a pool and Jacuzzi" to

---

[3] Dr. Jimenez's initial report also stated that it was also his "opinion that the 13% whole person impairment d[id] not accurately reflect his true impairment as to activities of daily living as enumerated above," and "[t]herefore, [he] . . . utilize[d] the en banc decision of *Almaraz-Guzman* and place[d] him into DRE lumbar Category IV with a 23% whole person impairment."  *Id.* at 1219.  However, in a supplemental response, Dr. Jimenez clarified that he "placed [Sund] into DRE Lumbar Category III, with a resultant Whole Person Impairment of 13% . . . because [he] believe[d] the compression fracture was greater than 25% . . . [and] [t]he compression fracture was 25%-50% of one vertebral body, which would place him under that DRE Lumbar Category III (10%-13% WPI)."  *Id.* at 1209.

allow for water exercise.  *Id.* at 1218–19.

### 5.   Stephen Giles

Sund saw Stephen G. Giles, PA-C, a neurosurgery physician assistant for a lumbar spine consult on May 1, 2020.  *Id.* at 666–82.  Giles noted the following about Sund: at the time of the appointment:  he had two out of ten level lower back pain that he described as "dull and aching"; the pain "affects the right buttocks at time[s]"; Sund had "a single episode of shooting [left] lower extremity pain in December 2019 that resulted in a fall and [right] foot fracture"; "[o]xycodone is not routine but pm for pain flares"; and his "back pain is made worse by sitting, bending, walking and standing," but it improves with "lying down and sometimes . . . with walking as well."  *Id.* at 668.  Giles conducted a physical exam of Sund's musculoskeletal system and found that his gait was "[n]ormal" because he "ambulate[d] on heels and toes and he was "able to tandem walk"; his tone was "[n]ormal . . . in upper and lower extremities"; his "[s]ensation [was] grossly intact to light touch BLEs"; and his Romberg test was normal.  *Id.* at 670.

Giles's assessment was that Sund had a healed "L2 compression fracture," *id.* at 671, with approximately 50% height loss and "mild tightness at the L4-5 level where the nerves exit the spine-[left] greater than right," *id.* at 676; "[c]hronic lower back pain," *id.* at 671; and "[l]umbar spondylosis," *id.*  Giles referred to Sund physical therapy and for x-rays that show the lumbar spine's flexion and extension.  *Id.*

### 6.   Physical Therapy in 2020

Sund had ten physical therapy sessions between May 14, 2020 and June 30, 2020.  *Id.* at 426–538, 699–722, 727–73.  During Sund's initial visit on May 14, the physical therapist noted that Sund had "major limitation in lumbar flexion, extension, and bilateral side bending, and moderate limitation in bilateral rotation"; "a positive SLR and slump test"; "weakness in his back and hip extensors and hypersensitivity to palpation of the lumbar vertebrae"; and "kyphotic" posture.  *Id.* at 701.  Sund set two goals: (1) "increased lumbar mobility in all planes at least 10 deg[rees], *id.*, and (2) to "be able to walk more than 1 mile on the beach without exacerbation of symptoms," *id.* at 702.  The aggravating factors for his pain were "sitting, walking on uneven ground, bending forward, lifting, [and] making bed", and the easing factor was "lying down."  *Id.*

at 704.  The physical therapist also stated that after Sund fell down two steps, he "can walk only for a short while before he has to lie down to stop pain," and "can sit only 10 min before pain causes him to stand up and then lie down for 20 min."  *Id.*  However, "[p]rior to fall he was independent with mild to moderated chronic back pain; but walking 2-5 miles on the beach daily."[4]  *Id.*

Sund had subsequent sessions on May 18, 20, and 27, where he "[p]rogress[ed] as expected."  *Id.* at 730, 748, 766.  On May 18, Sund reported that his lower back pain was at a zero out of ten, *id.* at 730; on May 20, his back "fe[lt] good," *id.* at 748; and on May 27, he "report[ed] that his back and foot [were] improving."  *Id.* at 766.

Sund had three additional sessions in June.  First, on June 2, Sund had no pain, but complained that he was "stiff."  *Id.* at 430.  Second, on June 4, Sund reported that he went on a two mile walk on the beach, *id.* at 449, and the physical therapist noted that in exercises, Sund was more "limited . . . by ankle pain than back pain," *id.* at 452.  Third, on June 11, Sund stated that he thought "he overdid with exercises last session as his foot swelled up for a couple of days and was unable to walk."  *Id.* at 468.

On June 23, Sund had an appointment to assess his progress.  The notes stated that after physical therapy, "[t]he quality of [Sund's] gait has improved though he still presents with [right] foot pain and stiffness."  *Id.* at 486.  Sund reported that he felt that his walking had improved, but he still had "significant stiffness with prolonged sitting for [more] than 20 minutes or so, globally."  *Id.*  Sund met his goal of "increas[ing] lumbar mobility in all planes at least 10 deg[rees]," but had not yet met his goal of "walk[ing] more than 1 mile on the beach without exacerbation of symptoms."  *Id.*  Sund also added a new goal of "be[ing] able to sit for longer than 30 minutes in order to participate in work duties."  *Id.*  At the time of the appointment, Sund stated that he was "limited to 5-10 minutes sitting tolerance due to low back."  *Id.*

---

[4] In his opposition to Hartford's trial brief, Sund argues that his ability to walk 2-5 miles on the beach refers to his ability prior to the accident in 2018.  ECF No. 42 at 19 n.3.  However, the only fall referred to in the physical therapist's notes is one after the accident where he broke his foot.  ECF No. 39-1 at 704.  Accordingly, the Court finds that Sund could regularly walk two to five miles on the beach before December 2019.

United States District Court
Northern District of California

Finally, Sund had two additional sessions at the end of June.  During his June 25 session, the physical therapist noted that Sund's "back pain improved with continual movement through[out] the day rather than focusing one time on exercises[]."  *Id.* at 516.  But during his June 30 session, Sund stated that he had "increased back pain over the past 2 weeks," which "he attributes" to his dog pulling on the leash more when he walked the dog.  *Id.* at 529.

### 7.  **Physical Capacity Evaluation with Erin Magaw**

On August 26, 2020, physical therapist Erin Magaw conducted a Physical Capacity Evaluation of Sund.  *Id.* at 543–71.  Magaw wrote that "Sund gave a reliable, valid effort during testing, with 25 consistency measures yielding a reliability score of 47 out of 50 (94%)[,] . . . demonstrated patterns of movement and physiological responses were consistent with maximal effort[, and] . . . [t]here was consistency between the test results and the referral diagnosis."  *Id.* at 543.  Magaw concluded that "Sund's acceptable Occasional Lifting capabilities are at the Sedentary Physical Demand Category," which mean that he was limited to lifting 10 pounds for floor to knuckle, knuckle to shoulder, and shoulder to overhead lifts, but could lift in 12.5 pounds in a two-hand carry.  *Id.*

Additionally, Magaw opined on Sund's work abilities.  First, Sund "demonstrated sufficient strength to perform the following activities:" (1) in the "heavy" category: pushing, pulling; (2) in the "light" category: mid lift; and (3) in the "sedentary" category: high lift, low lift, full lift, carrying, and overall strength.  *Id.*  The heavy category is 51-100 pounds; the light category is 11-20 pounds; and the sedentary category is 1-10 pounds.  *Id.* at 551.

Second, Sund was "able to perform the following activities:" (1) reaching immediately in front of him to the right and left and bi-manual handling on a constant basis; (2) walking, reaching overhead in front of him to the right and left, handling left, fingering right and left on a frequent basis; and (3) sitting, standing, and bending on an occasional basis.  *Id.* at 543.  Sund "did not demonstrate the ability to . . . [c]rouch[]" or "[k]neel[]."  *Id.* at 544.  Additionally, while Sund was walking during the evaluation, he "report[ed] increased low back pain" and "[m]aintained [his] left hand against left lumbar region for self relief."  *Id.* at 549, 565.  On a constant basis means 67%-100% of the day; on a frequent basis means 34-66% of the workday; and on an occasional basis

means 0-33% of the workday.  *Id.* at 551.

**D.      Sund's Initial Disability Claims**

Sund was approved for short-term disability benefits through Amazon from February 2, 2019 through August 2, 2019.  *Id.* at 169.  On May 31, 2019, Hartford started a long-term disability claim for Sund, which he submitted on July 17, 2019.  *Id.* at 71, 828–32.  Sund supported his claim with medical records from Kaiser Permanente and Dr. Huebert, as well as Dr. Jimenez's report.  In reviewing Sund's claim, Hartford also considered the "Senior OEM Business Manager" job description received from Amazon and the occupational analysis completed by vocational rehabilitation clinical case manager Amoreena Burton.  Burton concluded Sund's position was the equivalent of a "Direct, Research and Development (DOT Code: 189.117-014) as defined and classified in the Dictionary of Occupational Titles, 1991 edition."  *Id.* at 40.  This is a sedentary occupation, which means it is one that involves "[e]xerting up to 10 pounds of force occasionally and/or negligible amount of force frequently to lift carry, push, pull, or otherwise move objects, including the human body" and "involves sitting most of the time, but may involve walking or standing for brief periods of time."  *Id.*

Hartford denied Sund's long-term disability claim on June 1, 2020.  *Id.* at 140.  Hartford concluded that Sund's position was sedentary, and therefore, he was not disabled because his only workplace restrictions were "[n]o bending, stooping[,] or lifting greater than 10lbs" and "[n]o prolonged walking, standing, sitting[,] or climbing."  *Id.* at 142.

**E.      Sund's Appeal**

Sund submitted a timely written appeal of Hartford's denial on November 24, 2020.  *Id.* at 572–95.  Sund submitted the following additional evidence in support of his appeal: (1) updated medical records, with records from Giles, Dr. Richardson, and Sund's physical therapy sessions, *id.* at 599–774; (2) a statement from Dr. Richardson, *id.* at 540–41; (3) Sund's physical capacity evaluation with Magaw, *id.* at 543–71; (4) statements from Sund and his family, *id.* at 380–85; and (5) a rebuttal occupational analysis from Linda Hayes, *id.* at 387.

In her October 2020 statement, Dr. Richardson stated that Sund has been her patient since June 2019, and that after his accident in 2018, "he has been unable to return to his full function"

17

1    and "has had minimal improvement with physical therapy." *Id.* at 540.  Dr. Richardson explained

2    that Sund "is unable to bend, walk[,] or sit for a prolonged period," and that specifically he

3    "requires lying prone to rest if he does any of these activities longer than 20 minutes." *Id.*

4    Further, "[h]e has difficulty lifting any objects > 5." *Id.*  Dr. Richardson concluded that "[b]ased

5    on [her] knowledge, training, experience[,] and [her] clinical treatment of . . . Sund as well as [her]

6    review and analysis of his medical history, it is [her] professional opinion that . . . Sund is totally

7    disabled and unable to perform the substantial and material duties of his own occupation," and he

8    has been totally disabled since February 2019.  *Id.* at 541.

9          Sund's July 2020 statement described the accident, the treatment he received after the

10   accident, and the impact the accident has had on his daily life.  *Id.* at 380–83.  Sund also described

11   his December 2019 accident where he fell down "2 stair steps in [his] home because [his] back

12   spasmed and . . . [he] twisted [his] right foot and broke three middle metatarsal bones." *Id.* at 381.

13   Sund explained that he cannot engage in activities that he enjoyed before the accident like biking,

14   hiking, playing basketball and tennis, fishing, riding in boats, playing with his grandchildren,

15   making his bed, and doing "any household chores that require bending, lifting, or twisting." *Id.* at

16   382.  Sund also stated that "[d]ue to the accident and resulting injuries, [he has] not been able to

17   perform [his] occupational duties, including but not limited to:" (1) "[t]ravel to customer facilities

18   in Asia or United States" and "[t]our[ing] factory or equipment build status for existing orders"

19   while traveling because "[he has to] recline fully for 10-15 minutes per hour and need[ed] to be

20   able to sit or stand the remaining time in an ergonomic chair," which was not possible on the 21

21   hour flights to Asia or even on the three to six hour flights required for domestic work travel; and

22   (2) "[n]egotiate contracts" because that required having "in person meetings" and he could not

23   "work at Amazon's San Jose or Sunnyvale offices because [he] cannot carry [his] work backpack

24   the distance from [his] car to the office, and is unable to sit more than roughly 30 minutes without

25   reclining, which is not feasible as all meetings are 1+ hours in length." *Id.* at 383.

26         Sund's aunt and children also submitted statements written in July 2020 regarding's

27   Sund's condition.  *Id.* at 384–85.  Sund's aunt, Jeanette Stevens, stated that Sund came to live with

28   her because she "had maids and a maintenance employee that could assist him with the everyday

United States District Court
Northern District of California

lifting and work activities he needed to do on a daily basis[.]" *Id.* at 384.  "In exchange he helps [her] read, answer phones, and cooks [their] meals." *Id.*  Stevens also stated that Sund can walk on the beach, but only for "30-50 minutes per day," and that Sund's "back has improved a bit since" he moved to Oregon "until he fell down 2 stairs because of a back pain spasm." *Id.* Stevens described that Sund "is up and about from 7 AM to 3 PM and during this time he sits, stands, or reclines every 20 minutes or so depending on back pain and activity being done." *Id.* Sund's children wrote that the accident had "adversely impact[ed]" their dad's quality of life. *Id.* at 385.  They explained that their "dad was an active person who enjoyed outdoor activities as well as kept busy inside the house that required flexibility and mobility (he helped raise 3 kids), but his work accident in China has greatly hindered his ability to lift, carry, bend, and just move around like he used to[.]" *Id.*

Hayes's occupational analysis was based on her review of Sund's medical records, resume, Amazon's job description, and a worker's compensation report. *Id.* at 388.  Hayes concluded that Sund's "job[] f[e]ll within the light strength category and requires standing and walking most of the day." *Id.* at 391.  Hayes further concluded that Sund "does not meet the physical capability for a light strength occupation / job and is not capable of performing even a sedentary job as per the restrictions placed on him by his treating physicians and confirmed by the" physical capacity evaluation. *Id.* at 391–92.

In evaluating this appeal, Hartford hired Dr. Sarah White to conduct an "independent medical review" of Sund's file.  Dr. White reviewed Sund's medical records, but did not have a "peer to peer physician teleconference" with any of Sund's treating physicians and never physically examined Sund. *Id.* at 110.  On December 21, 2020, Dr. White issued a report, concluding that "Sund "suffers from a combination of" a "healed lumbar L2 compression fracture . . . , lumbar spondylosis, and healed right food 1st, 2nd, and 3rd metatarsal fractures, . . . which supported functional impairment and restrictions/limitations on his activities, as of 2/2/19 to present." *Id.* at 113.  Dr. White stated that Sund could "sustain [the following] full time activities throughout an 8 hour day [and 40 hour work week] . . . as of 2/2/19 to present": (1) "lifting, carrying, pushing, and pulling up to 20 pounds occasionally" using both upper extremities," *id.* at

115; (2) lifting, carrying, pushing, and pulling up to 10 pounds frequently using both upper extremities," *id.*; (3) "reaching with the right or left upper extremity above the shoulder, above the waist, at waist/desk level, or below the waist," *id.*; (4) "fingering, gripping, grasping, handling, feeling, typing, keyboarding, or manipulating with the right or left upper extremity," *id.* at 113–14; (5) sitting; (6) standing or walking "for 1 hour continuously for a total of 6 hours per day," *id.* at 114; (7) "occasionally kneel[ing], crouch[ing], climb[ing] stairs, bend[ing] at the waist, and balanc[ing]," *id.*; and (8) frequently driving, *id.*  Additionally, "[t]he medical evidence provided does not support a need for . . . Sund to lay down throughout the day" and to have "[e]ndurance restrictions." *Id.*  These work "restrictions and limitations" were "permanent, as of 2/2/19 to present and on-going due to the chronic nature of his conditions." *Id.*

Additionally, Dr. White concluded that Sund's "self-reported symptoms, fatigue and the self-reported inability to work" and Dr. Richardson's "opinion concerning . . . Sund's physical functionality" were "inconsistent with the clinical findings of normal strength, normal sensation, no focal neurologic deficits, normal cranial nerves, normal heel walk, normal toe walk, normal tandem walk, normal tone, symmetric reflexes, and negative Romberg." *Id.* at 114–15.  She further concluded that Dr. Richardson's opinion was "inconsistent with the findings on the" physical capacity evaluation. *Id.* at 115.

The end of Dr. White's report contained eleven questions for Sund's attending physician, to which Dr. Richardson responded on January 29, 2021. *Id.* at 348–51.  Dr. Richardson did "not agree with" Dr. White's report "because it does not address . . . Sund's pain that is caused" by lifting, carrying, pushing, pulling, standing, walking, and sitting. *Id.* at 349.  She explained that while Sund "can lift, carry, push[][,] and pull up to 20 lbs. occasionally and 10 lbs. frequently and using both his upper extremities . . . [,] this causes increased exacerbation of his back pain requiring him to lay down for at least 20 min[utes] to recover." *Id.*  Additionally, she stated Sund "can[not] stand or walk for 1 hr. continuously (6 hrs. total)," rather he "was able to walk up to 45 min[utes] prior to his foot fracture but he would then need to lie down for an hour to recuperate from his back pain." *Id.*  And Sund "can occasionally kneel, crouch, climb stairs, and drive but [he] has difficulty bending at [the] waist without pain or need for assistance." *Id.*  Dr. Richardson

opined that for Sund "[t]o do these activities without pain[,] he would need to take a substantial amount of pain medication that would cause cognitive impairment and sedation." *Id.*  Dr. Richardson also reiterated that it was her opinion that "Sund is totally disabled and unable to perform the substantial and material duties of his own occupation," and "has been and remains totally disabled since February 2019." *Id.* at 350.

On February 11, 2021, Sund also responded to Dr. White's analysis, arguing that it was "not reliable, as she omitted evidence supportive of . . . Sund's claim." *Id.* at 234.  Hartford responded to Sund and Dr. Richardson with an updated report by Dr. White dated February 25, 2021. *Id.* at 100–04.  Dr. White stated that Sund and Dr. Richardson's responses did "not change [her] opinion." *Id.* at 103.  Dr. White explained that the normal "measurable findings carry far more clinical weight than nonmeasurable findings" like Sund's "self-reported nonmeasurable pain." *Id.*

Sund responded to Dr. White's second report on April 23, 2021, arguing that Dr. White's conclusions contradict those of the other physicians who treated Sund and attaching a new statement from Dr. Richardson. *Id.* at 198–200, 205.  In response to Dr. White's opinion that "Sund's self-reported complaints of pain and tenderness are non-measurable and conflict with clinical findings," *id.* at 205, Dr. Richardson stated that she had "personally treated . . . Sund and [has] no reason to disbelieve his self-reported complaints of pain and tenderness," and that his "self-reported complaints are clinically supported by his medical records," the physical capacity evaluation, and the qualified medical examination. *Id.*  She also stood "by the statement that [Sund] has been and remains totally disabled since February 2019." *Id.*

Dr. White wrote a subsequent report on April 30, 2021 in response to Dr. Richardson's statement. *Id.* at 90–95.  Dr. White stated that she disagreed with Dr. Richardson's opinion regarding "Sund's physical functionality" because as she had stated in her previous reports, it was "inconsistent with the clinical findings of normal strength, normal sensation, no focal neurologic deficits, normal cranial nerves, normal heel walk, normal toe walk, normal tandem walk, normal tone, symmetric reflexes, and negative Romberg," as well as the physical capacity evaluation. *Id.* at 93.  On May 25, 2021, Sund responded to this report, again arguing that it was incorrect, *id.* at

175–80, and that "Dr. White's opinions regarding . . . Sund's disability should not be given

deference over the opinions of the physicians who have actually examined . . . Sund," *id.* at 179.

Hartford denied Sund's appeal on June 11, 2021, *id.* at 73–79, concluding that "Sund

maintained the functional capacity to consistently perform full-time work with restrictions and

limitations described" by Dr. White, *id.* at 78.  Accordingly, Hartford concluded that Sund "was

not [d]isabled from his . . . sedentary [o]ccupation throughout and beyond the [e]limination

[p]eriod as required by the Policy[.]"  *Id.*

## V.     REQUEST FOR JUDICIAL NOTICE AND EVIDENTIARY OBJECTIONS

Sund requests that the Court take judicial notice of the Dictionary of Occupational Titles'

("DOT") description of a "Director, Research and Development"; (2) "Appendix C to the DOT";

and (3) the DOT's descriptions of three occupations, "Purchasing Agent," "Contract Specialist,"

and "Buyer."  ECF No. 40-1 ¶¶ 6, 8–9.  Hartford does not dispute that the DOT documents are

judicially noticeable, but objects to this evidence because it is not in the administrative record and

"[e]xtrinsic evidence should only be considered under limited circumstances" which are not

present here.  ECF No. 41 at 25.

"Under de novo review, the district court" considers only "evidence in the administrative

record and 'other evidence as might be admissible under the restrictive rule of *Mongeluzo* [*v.

Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir.1995)].'"  *Opeta v. Nw.

Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting *Kearney*,

175 F.3d at 1094).  Under that approach, the district court can consider extrinsic evidence "only

under certain limited circumstances," and "only when circumstances clearly establish that

additional evidence is necessary to conduct an adequate de novo review of the benefit decision."

*Id.* (quoting *Mongeluzo* 46 F.3d at 944) (emphasis omitted).

Some district courts have applied the framework outlined in *Mongeluzo* and *Opeta* when

determining whether to consider portions of the DOT not in the administrative record.  *E.g.*,

*Harlow v. Metro. Life Ins. Co.*, No. EDCV 17-2091 JGB (SPx), 2019 WL 1894752, at *3 (C.D.

Cal. Mar. 11, 2019) (denying a request to take judicial notice of DOT job title because none of the

"exceptional circumstances" enumerated in *Opeta* and *Mongeluzo* were present and it was not

necessary to consider "this additional job title . . . to conduct an adequate de novo review of the benefits decision"). This Court, however, is not persuaded by that approach. "The DOT has been 'recognized as a widely used and reasonable reference for administrators and courts to use under ERISA' in order to conduct a vocational analysis." *Popovich v. Metro. Life Ins. Co.*, 281 F. Supp. 3d 993, 1006 (C.D. Cal. 2017) (quoting *Ramos v. United of Omaha Life Ins. Co.*, No. 12-cv-03761-JST, 2013 WL 4343413, at *5 (N.D. Cal. Aug. 13, 2013)); *see also Sandoval v. Reliance Standard Life Ins. Co.*, No. 2:20-cv-03061-SVW-KS, 2021 WL 1523910, at *9 (C.D. Cal. Mar. 5, 2021), *appeal dismissed*, No. 21-55366, 2021 WL 3028082 (9th Cir. June 25, 2021) ("[T]he Dictionary of Occupational Titles[] [is] a source on which courts regularly rely in ERISA cases."); *Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 940 n.4 (N.D. Cal. 1999) ("Given the amount of research and analysis that has gone into grouping similar jobs and defining the occupational titles, and the length of time the D.O.T. has been widely used, it is reasonable for plan administrators, and courts, to use it for determining a claimant's 'regular occupation.'"). Additionally, because consideration of the DOT "concerns a legal issue, not a factual one . . . [,] consideration of [it] would be different than a de novo judicial review of factual matters such as medical evidence." *Perez-Jones v. Liberty Life Assurance Co. of Bos.*, No. LA CV11-09518 JAK (AJWx), 2013 WL 12126747, at *7 (C.D. Cal. Apr. 30, 2013) (considering a severance agreement not in the administrative record because it did "not interfere with the administrator's prior factual analysis with respect to medical evidence"). Accordingly, the Court concludes that it may consider DOT excerpts that are not in the administrative record, and it is not required to apply the framework outlined in *Opeta* and *Mongeluzo* before considering them.[5]

In sum, the Court agrees with Sund that it may consider the DOT, and overrules Hartford's objections. However, because the Court considers only Appendix C of the DOT in its conclusions of law, it grants in part Sund's request for judicial notice of Appendix C, and denies in part as moot Sund's request for judicial notice of the DOT's descriptions of "Director, Research and

---

[5] Even if the Court were to apply *Opeta* and *Mongeluzo*, it would conclude that the "circumstances clearly establish that" consideration of Appendix C of the DOT "is necessary to conduct an adequate de novo review of the benefit decision." *Opeta*, 484 F.3d at 1217 (emphasis omitted).

United States District Court
Northern District of California

1   Development," "Purchasing Agent," "Contract Specialist," and "Buyer."

2   **VI.   CONCLUSIONS OF LAW**

3           The parties seek opposing judgments: Sund requests a judgment "overturn[ing] Hartford's

4   denial" of his long-term disability benefits claim and [o]rdering it to pay . . . Sund benefits over

5   the 24-month Policy period," ECF No. 40 at 30, and Hartford requests a judgment upholding its

6   decision to deny Sund's long-term disability benefits claim, ECF No. 41 at 26.  The parties dispute

7   whether Sund's occupation should be classified as "sedentary" or "light," as well as whether Sund

8   has proven by a preponderance of the evidence that he is disabled from performing a sedentary or

9   light occupation.  ECF Nos. 40 at 22–30, 41 at 16–26, 42 at 7–25, 43 at 5–17

10          "ERISA was enacted 'to promote the interests of employees and their beneficiaries in

11  employee benefit plans,' and 'to protect contractually defined benefits.'"  *Firestone Tire & Rubber*

12  *Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted).  ERISA "permits a person

13  denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro.*

14  *Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "ERISA's civil-enforcement provision . . .

15  allows a claimant 'to recover benefits due to him under the terms of his plan [and] to enforce his

16  rights under the terms of the plan.'"  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th

17  Cir. 2010) (quoting 29 U.S.C. § 1132(a)(1)(B)).

18          "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

19  standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

20  determine eligibility for benefits or to construe the terms of the plan."  *Firestone*, 489 U.S. at 115.

21  The parties agree that de novo review is appropriate here.  ECF No. 25.

22          Under de novo review, "the court simply proceeds to evaluate whether the plan

23  administrator correctly or incorrectly denied benefits," with no deference given to the

24  administrator's decision.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006)

25  (en banc).  "[W]hen the court reviews a plan administrator's decision under the de novo standard

26  of review, the burden of proof is placed on the claimant."  *Muniz*, 623 F.3d at 1294.  "[T]he

27  claimant has the burden of proving by a preponderance of the evidence that he was disabled under

28  the terms of the plan."  *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162–63 (9th Cir. 2016).

*United States District Court*
*Northern District of California*

Sund can recover the benefits denied to him under the Policy only if he shows that he was

"prevented from performing one or more of the [e]ssential [d]uties of . . . [his] [o]ccupation"

between February 2, 2019 and August 2, 2019.  ECF No. 39-1 at 1300.  The Court concludes that

Sund has met his burden proving that under the Policy he is disabled and that he cannot perform

either a sedentary or light occupation.[6]

       First, the DOT defines "sedentary work" as:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

U.S. Dep't of Labor, *Dictionary of Occupational Titles,* App'x C, available at

https://perma.cc/A67M-4CF2 (last visited Aug. 11, 2023).  The Ninth Circuit has held that "an

employee who cannot sit for more than four hours in an eight-hour workday cannot perform

'sedentary' work that requires 'sitting most of the time.'"  *Armani*, 840 F.3d at 1163.  In *Armani*,

"[t]he administrative record available to the district court plainly showed that, . . . every physician

and chiropractor who treated Armani determined that he could not sit for more than four hours a

day."  *Id.*  Accordingly, the Ninth Circuit held that "the district court erred in denying [the

plaintiff] his long[-]term disability benefits under the Plan."  *Id.* at 1164.

       Here, the consensus of Sund's treating doctors and physical therapists is his L2

compression fracture prevents him from sitting for prolonged periods of time.  Between October

2018 and May 2019, Dr. Pham and Dr. Grover stated that at work, Sund "[m]ay alternate sit/stand

on as tolerated basis," *id.* at 914, 996, 1212–16, which Sund stated was around 20 or 30 minutes

before his symptoms were aggravated, *id.* at 913, 925, 1151, 1209.  Additionally, later in his P&S

report, Dr. Pham concluded that Sund would "require permanent work restrictions including," that

he must "alternate between sitting and standing as tolerated," and also must "[a]void prolonged

---

[6] Because Sund has met his burden regardless of whether his position is sedentary or light, the Court does not resolve that dispute.

United States District Court
Northern District of California

standing, walking, or sitting, a maximum of 30 minutes per hour." ECF No. 39-1 at 1153. Dr. Jimenez stated that Sund needed "[d]isability/work preclusions" that included "no prolonged walking, standing, sitting or climbing." *Id.* at 1218. Magaw concluded that Sund could only sit, stand, and bend "[o]n an occasional basis," *id.* at 543, which means from 0 to 33% of the workday, *id.* at 551. Finally, Sund's treating physician, Dr. Richardson, stated that Sund "has been and remains totally disabled since February 2019" and cannot "perform the substantial and material duties of his own occupation."[7] *Id.* at 350, 541.

While Sund's doctors did not place a time limitation on his ability to sit like those in *Armani*, Magaw concluded that Sund cannot sit for more than one third of the day, a lesser period of time than the one found disabling in *Armani*. Dr. Pham also stated that Sund could not sit for longer than 30 minutes per hour, which necessarily means that Sund, like the plaintiff in *Armani*, cannot sit for more than half of the day. Accordingly, Sund has established that he cannot perform a sedentary occupation because it requires "sitting most of the time." *Armani*, 840 F.3d at 1163 (noting that "the logical conclusion [when] an employee . . . is unable to sit for more than half of the workday" is that the employee "cannot consistently perform an occupation that requires sitting for 'most of the time'"); *see also Williamson v. Aetna Life Ins. Co.*, No. 2:17-cv-02653-RFB-CWH, 2019 WL 1446957, at *5 (D. Nev. Mar. 31, 2019) ("Because sedentary work requires 'sitting most of the time,'" a conclusion that the plaintiff "could perform full-time sedentary work" was "inconsistent with [the] analysis that Plaintiff must alternate sitting and standing twice to three times every 20-30 minutes"); *Reetz v. Hartford Life & Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1084–85 (W.D. Wash. 2018) (holding that the plaintiff could not perform a sedentary level occupation because of her treating doctor's conclusion that the plaintiff "can sit for only 30 minutes at a time for a total of less than six hours a day"); *Schramm v. CNA Financial Corp.*

---

[7] While Dr. Jimenez, Magaw, and Dr. Richardson's reports were completed after the elimination period, the Court still considers them because they assess Sund's physical capacity in light of his lower back pain caused by his L2 compression fracture and the reports' conclusions are based on symptoms and findings reported during the elimination period. *See Fontana v. Guardian Life Ins.*, No. C 08-01231 CRB, 2009 WL 73743, at *4 (N.D. Cal. Jan. 12, 2009) ("Medical reports made after the period of disability may or may not be relevant to determine if a beneficiary was disabled at an earlier date, but they are not irrelevant solely because of their date.").

United States District Court
Northern District of California

*Insured Grp. Benefits Program*, 718 F. Supp. 2d 1151, 1163 (N.D. Cal. 2010) (concluding that because the plaintiff "could not sit for more than three-and-a-half hours, and for no more than one hour at a time . . . [i]t is not likely, . . . that Plaintiff could complete her duties in . . . sedentary occupations while either standing or walking for the balance of her day").

Second, the DOT defines "light work" as:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

U.S. Dep't of Labor, *Dictionary of Occupational Titles,* App'x C, available at https://perma.cc/A67M-4CF2. Here, the conclusions of Sund's treating doctors and physical therapists establish that he cannot perform light work. Dr. Pham concluded that Sund cannot lift, push, or pull objects weighing more than five pounds, *id.* at 1153; Dr. Richardson concluded that Sund "has difficulty lifting any object" that weighs more than five pounds, *id.* at 540; and Dr. Jimenez concluded that Sund cannot lift objects greater than ten pounds, *id.* at 1218. Dr. Jimenez, Dr. Richardson, and Dr. Pham have also concluded that Sund should not stand or walk for prolonged periods of time. *Id.* at 540, 1153, 1218. And Dr. Pham stated that Sund should limit standing and walking to thirty minutes per hour. *Id.* at 1153. While Magaw concluded that Sund could walk between 34 and 66% of the day and can push and pull objects between 51 and 100 pounds, Magaw also concluded that Sund's overall strength category was "[s]edentary," *id.* at 545. Accordingly, the weight of the medical evidence demonstrates that Sund's physical abilities since his injury prevent him from performing light work.

Hartford's arguments to the contrary are unavailing. First, Hartford argues that Sund is not disabled because the medical records show that Sund's condition "improve[d]"; he had "low

levels of pain"; he was physically active; he did not regularly take pain medication; "he had sporadic and infrequent visits with his doctors"; and "failed to follow through with referrals," including those for consultations on vertebroplasty or kyphoplasty procedures.  ECF No. 43 at 6–7.

A complete review of the medical records, however, tells a different story.  Sund had consistent medical treatment from September 2018 through at least August 2020.  Sund has explained that any gaps in his medical treatment were because of his ongoing California workers' compensation case or because his doctors stated that he was not a candidate for treatment.  *E.g.*, ECF No. 39-1 at .  Moreover, Hartford has not provided any evidence that following up on certain referrals or procedures would have improved Sund's condition such that he would not have been disabled.

Additionally, while at times Sund did report minimal or a lack of back pain and he did not regularly take pain medication, he also consistently reported that he had back pain that was exacerbated when he performed his occupational duties like standing and sitting for prolonged periods.  *E.g.*, *id.* at 704, 925, 1209.  From these facts, the Court concludes that instances of minimal pain or lack of pain medication were attributable to the fact that Sund was not consistently performing activities that exacerbated his pain.  Accordingly, the Court does not conclude that instances where Sund had minimal pain or did not take pain medication "constitute[] proof positive that []he was not in chronic pain."  *Stratton v. Life Ins. Co. of N. Am.*, 589 F. Supp. 3d 1145, 1181 (S.D. Cal. 2022).

Finally, while there is some evidence that Sund could walk for several miles at a time, there is also evidence that this walking was done at the encouragement of his treating doctors, ECF No. 39-1 at 608, and that the walking exacerbated his pain, *id.* at 549.  Thus, the Court does not conclude that this evidence "mandate[s] a finding that Plaintiff was not disabled."  *Stratton*, 589 F. Supp. 3d at 1182 (collecting cases and holding that the plaintiff was incorrectly denied benefits despite the plaintiff's reports of minimal pain, as well as her ability to drive, use her computer, "walk up to 3 miles per day, do yoga and Pilates, cook, shop, garden, and do laundry and other household and personal tasks").

Second, Hartford argues that Sund's continued part-time employment at Amazon for four hours per day demonstrates that he is not disabled. ECF No. 41 at 17. However, under the Policy, the ability to work for 30 hours per week is an essential duty. ECF No. 39-1 at 1300. Thus, Sund was actually unable to perform an essential duty during this period. More importantly, while Sund did work for Amazon for four months after the accident, Amazon could not accommodate Sund's required work modifications, which supports that Sund was disabled.[8]

Third, Hartford argues Dr. Richardson's "disability support letters do not withstand scrutiny" because she did not start treating Sund until June 2019; "[t]here is no indication that Dr. Richardson . . . reviewed Sund's Kaiser records or considered the restrictions and limitations from Drs. Pham or Jimenez"; and she "did not treat Sund for a back condition when he started his internal medicine." ECF No. 43 at 11. This misstates the record. Dr. Richardson did treat for his back pain, ECF No. 39-1 at 606, 1263–66, and she stated that her conclusions were based on her "clinical treatment of . . . Sund as well as [her] review and analysis of his medical history[,]" *id.* at 541. The Court credits Dr. Richardson's conclusions because they consistent with those from the rest of Sund's treating doctors.

Finally, Hartford argues Dr. White's conclusion that Sund can perform the essential duties of both sedentary and light occupations demonstrates that he was not disabled. ECF No. 41 at 20–21. Dr. White never physically examined Sund and only conducted a paper review of his medical records. ECF No. 39-1 at 109–110. "Although [Hartford] is not required to ask its physicians to conduct an in-person examination, the Ninth Circuit has viewed 'pure paper' reviews with some skepticism." *Popovich v. Metro. Life Ins. Co.*, 281 F. Supp. 3d 993, 1004–05 (C.D. Cal. 2017); *see also Gonzalez-Schultz v. Unum Life Ins. Co. of Am.*, No. CV 20-6837-RSWL-JCX, 2022 WL 17839054, at *10 (C.D. Cal. Nov. 16, 2022) ("[I]n exercising its discretion, the Court may give

---

[8] Hartford also points to the fact that Dr. Pham stated that Sund had worked and could continue to "work a modified duty job" with "restrictions and limitations consistent with light duty work" as evidence that he can perform a light work occupation. ECF No. 43 at 8. But Dr. Pham was not using the term "light work" as it is defined by the DOT because the restrictions he placed on Sund's ability to work are inconsistent with the ability to perform a light occupation. Indeed, pursuant to the modifications required by Dr. Pham, Sund would be unable to exert ten and 20 pounds of force and could not walk, stand, or sit to a significant degree as required to perform light work. *Compare* ECF No. 39-1 at 1135 *with* ECF No. 40-1 at 15.

United States District Court
Northern District of California

1    greater weight to a treating physician's opinion where it is clear the physician has had a greater

2    opportunity to observe a patient than a physician retained by the plan administrator who conducts

3    a file review.").  Here, Sund's treating physicians have had a substantially greater opportunity to

4    observe Sund.  Additionally, Dr. White was the only doctor to conclude that Sund has no sitting

5    restrictions and can "lift[], carry[], push[], [or] pull[] up to 20 pounds occasionally."  ECF No. 39-

6    1 at 115.  Dr. White's conclusions are also primarily based upon the fact that Sund's medical

7    records demonstrate that he has "normal strength, normal sensation, no focal neurologic deficits,

8    normal cranial nerves, normal heel walk, normal toe walk, normal tandem walk, normal tone,

9    symmetric reflexes, and negative Romberg."  *Id.*  However, these normal findings "are not

10   determinative in this case" because they "do[] not materially counter the fact" that "the severity of

11   the pain resulting from" Sund's compression fracture "itself causes disabling pain that prevents

12   [him] from performing [his] job duties."  *Stratton*, 589 F. Supp. 3d at 1182 (quoting *Fagan v. Life*

13   *Ins. Co. of N. Am.*, No. C 09-2658 PJH, 2010 WL 3293702, at *11 (N.D. Cal. Aug. 19, 2010)).

14   Accordingly, the Court concludes that Dr. White's opinions should be afforded less weight than

15   those of Sund's treating doctors and they are insufficient to demonstrate that Sund has failed to

16   establish that he is disabled.

17        In sum, the Court concludes that Sund has proven by a preponderance of the evidence that

18   he was disabled under the terms of the Policy and was wrongfully denied long-term disability

19   benefits.

20                                        **CONCLUSION**

21        For the foregoing reasons, Sund's motion for judgment is granted, and Hartford's motion

22   for judgment is denied.  Sund shall provide a proposed form of judgment to Hartford within five

23   court days of the date of this order.  Within five court days thereafter, Hartford shall either sign the

24   proposed judgment, indicating its agreement only as to form, or provide written objections to the

25   form of judgment.  Within five court days of receiving Hartford's response, Sund shall file either

26   (1) an approved form of judgment or (2) a proposed form of judgment, a copy of Hartford's

27   / / /

28   / / /

objections, and a written response to the objections.  The objections and response may not exceed three pages each.

     **IT IS SO ORDERED.**

Dated:  August 11, 2023

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California